NOT DESIGNATED FOR PUBLICATION

Nos. 120,072
120,073

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of L.C., as grandparent of T.M.M.H.,
a Minor Child,
*Appellant*,

and

L.M.
(N/K/A L.F.),
*Appellee*.

MEMORANDUM OPINION

Appeal from Johnson District Court; NEIL B. FOTH, judge. Opinion filed January 10, 2020. Affirmed.

*Scott C. Nehrbass*, *James D. Oliver*, and *Sarah C. Otto*, of Foulston Siefkin LLP, of Overland Park, and *Joseph W. Booth*, of Lenexa, for appellant.

*Suzanne Valdez*, of Smith Legal, LLC, of Lawrence, for appellee.

*Stephanie Goodenow*, of Goodenow Law, LLC, of Lenexa, guardian ad litem.

Before GARDNER, P.J., BUSER, J., and LAHEY, S.J.

PER CURIAM: This case began as a grandparent visitation petition filed more than 10 years ago by the paternal grandmother. It morphed into a custody battle between Mother and Grandmother, as though it were a battle between two divorced parents. It was later consolidated with Grandmother's petition to determine parentage—she asked the

1

court to declare her to be the mother of her grandson, T.M.M.H. And both of these cases are intertwined with a separate adoption case also on appeal, in which Mother consented to her son's adoption by his stepfather. *Matter of Adoption of T.M.M.H.*, No. 119,944 (unpublished opinion) (this day decided).

After more than nine years of litigation between Grandmother and Mother over T.M.M.H., two significant events happened:  The chief judge removed the judge who had long handled the case and assigned a new judge; and T.M.M.H.'s stepfather adopted him. The new judge then granted Mother's motion under K.S.A. 2018 Supp. 60-260(b) to set aside the prior judge's previous rulings, restored full custody of T.M.M.H. to Mother, and granted Grandmother grandparent visitation only. Grandmother appeals.

We find that any rights Grandmother may have claimed as a parent ceased when her grandson's adoption was finalized. And any rights Grandmother may claim after her grandson's adoption are solely as a grandparent and are limited to visitation under the grandparent visitation statute. We affirm.

*Factual and Procedural Background*

The motions filed by the parties in these cases are too many to detail here, so we set forth an outline of the relevant facts. T.M.M.H. was born in November 2006, when Mother was 20 years old. Mother and T.M.M.H.'s biological father (Father) never married. When T.M.M.H. was around six months old, Father died. After Father's death, the paternal Grandmother offered financial assistance and child care assistance to Mother. When T.M.M.H. was around eight months old, Mother and T.M.M.H. moved in with Grandmother and her husband and lived there for about six months. Then, Mother and T.M.M.H. lived with T.M.M.H.'s great-grandmother for around 10 months.

In April 2008, Grandmother petitioned for grandparent visitation with T.M.M.H. In Mother's response to the petition, she stated she could not retain counsel, asked the court to appoint counsel, and requested a continuance of the hearing. Mother also explained that she was not opposed to allowing Grandmother visitation but thought it was in T.M.M.H.'s best interest to not yet allow overnight visits. No counsel was appointed for Mother.

In June 2008, Mother and Grandmother entered into a document drafted by Grandmother's counsel, captioned a "settlement agreement and permanent parenting plan" which the district court approved and incorporated as an order of the court. This was the first of three written agreements that Mother and Grandmother entered into from 2008 to 2010. Judge Thomas Kelly Ryan presided over these agreements and the ongoing custody, care, and visitation issues. None of the agreements terminated Mother's parental rights and no one suggested that Mother was unfit to parent T.M.M.H.

Under this first agreement, Grandmother was granted "parenting time a minimum of two days per week and every other weekend" until July 14, 2008. Thereafter, Grandmother was to be the "primary caregiver" for a minimum of three days per week. Among its terms was a guardianship provision stating "[t]his provision is also intended to have the same legal effect and to be in fact a provision granting Grandmother guardianship rights, while not in any way altering or limiting Mother's custodial rights."

The second agreement, captioned the "first amended parenting plan," was entered into in October 2008. Mother had decided to move to Colorado to live with her family, find employment, and get an apartment. The agreement's "sole legal custody" provision stated:

> "[T.M.M.H.] will be in Grandmother's exclusive care as Mother is leaving the
> community, as such Mother is granting by this agreement sole legal custody of

[T.M.M.H.]. This provision is also intended to have the same legal effect and to be in fact a provision granting Grandmother guardianship rights, while not in any way altering or limiting Mother's custodial rights."

T.M.M.H. lived with Grandmother, as contemplated by this agreement, and Mother was allowed contact with him when she was in "the Kansas City Metropolitan area." For the year that Mother was in Colorado, she saw T.M.M.H. only four times but called every three days.

The second agreement provided that if Mother moved back to the Kansas City area or wanted to establish a specific parenting plan, the parties would:

"First consult with a psychologist, social worker, or other child-development specialist of theirs or the court's choosing to make a reintegration plan that is in [T.M.M.H.]'s best interests and to assure that the reconnection will be beneficial to [T.M.M.H.], and the parties. Such counseling and review will precede any litigation regarding custody or parenting time in court, absent emergency circumstances."

This agreement, like the first, was entered without a hearing, without counsel for Mother, without the statutory findings required for grandparent visitation, and without mentioning Mother's fundamental right to parent her son.

Around one month before Mother moved back to Kansas in January 2010, she moved to terminate the agreement or modify it to allow Mother sole custody of T.M.M.H. The district court held an evidentiary hearing. Grandmother submitted a letter from T.M.M.H.'s therapist expressing concern about T.M.M.H.'s separation from Grandmother. The district court denied Mother's motion to take T.M.M.H. to Colorado and denied her motion to terminate the parenting plan. Mother did not appeal this decision but later proposed a new parenting plan—the third parenting agreement.

4

That third agreement, captioned "Parenting Plan, 1st Amendment to Mediated Agreement," was signed in October 2010. Mother was not represented by counsel, and Grandmother's counsel was not involved—the agreement was drafted by a mediator and case manager. It repeatedly refers to reintegration of T.M.M.H. with his Mother and clearly shows that it was intended to be temporary, not permanent. For example, its "residential custody provision" stated:

> "[T.M.M.H.] will continue living primarily with [Grandmother] as he is re-integrated into [Mother's] home. The full reintegration into [Mother's] home is hoped to be complete within one year of this agreement. We agree that at the year point in time, we will discuss whether [T.M.M.H.] is reintegrated and decide what the best living arrangement for him then is.
>
> . . . .
>
> "We agree that we intend to shift [T.M.M.H.]'s living arrangement to a point where he is living full time with [Mother] and will review our progress towards the reintegration every 3-6 months. We envision this happening by systematically adding one overnight at a time as we agree that [T.M.M.H.] is ready to handle it. Provided [T.M.M.H.] can handle it, we hope to have [him] living full time with [Mother] within the next 9-12 months.
>
> "After [T.M.M.H.] is living with [Mother] full time, we agree to establish a liberal visitation schedule with [Grandmother] that is mutually agreeable."

Her "joint legal custody" provision reinforces the temporary nature of the agreement:

> "We agree that we will share joint legal custody as the Court has ordered during this reintegration period. We jointly share in his care; have equal rights and responsibilities for him and we understand that neither of our rights is superior during this reintegration period. We will jointly make the major decisions regarding his residential schedule, education, child care, health/medical, and activities during this reintegration period. We further understand that this will remain in place until such time that we agree to revisit the topic in mediation in 6 months but no later than 9-12 months. We understand that we may at that point agree to alter the joint legal custody to some other

5

form of custody or grandparental rights plan. We agree that during that mediation we will define in greater detail what our rights are in whatever agreement we make.

"We agree that in addition to joint legal custody, [Grandmother] will retain guardianship rights."

Full reintegration never happened. None of the agreements between Mother and Grandmother contain Mother's express waiver of her rights under the parental preference doctrine or reference any knowledge by Mother of her fundamental constitutional right to parent her child. Similarly, no other record contains any waiver by Mother or any inquiry by the court into those areas.

In 2013, Mother married Stepfather, and Mother and Grandmother increasingly disagreed about T.M.M.H.'s care. Grandmother moved to modify parenting time and requested emergency ex parte relief, and the district court appointed a guardian ad litem (GAL) to represent T.M.M.H.'s interests. Then, the district court decided Grandmother's emergency motion without a hearing and ordered a revised temporary parenting schedule. Under that order, T.M.M.H. lived with Grandmother most of the time, and Mother usually had T.M.M.H. for a few hours on Thursdays and three weekends per month. This parenting schedule remained in place until August 2015.

In 2014, the GAL filed a proposed parenting plan in which Mother would receive residential custody of T.M.M.H. and Grandmother would receive visitation time, including some overnight visits. Mother moved to have the plan adopted. Grandmother opposed it and proposed her own parenting plan, requesting continued joint legal custody and primary residency with her.

A three-day evidentiary hearing took place in February 2015 to consider the parties' parenting time. Mother, supported by the GAL, requested sole legal custody and an access plan for Grandmother. Grandmother requested continuation of the joint custody order and parenting schedule. After the hearing, the district court ordered Mother to share

joint legal custody of T.M.M.H. with Grandmother and awarded Grandmother substantial parenting time. Yet the court never terminated Mother's parental rights or found her unfit to parent T.M.M.H.—no one ever contended that she was.

Six months after the evidentiary hearing, the district court entered its journal entry of joint custody. According to Mother, she intended to appeal this decision but her trial counsel failed to file a timely notice of appeal on her behalf. This led Mother to dismiss her appeal.

Also in 2015, Stepfather petitioned to adopt T.M.M.H. Mother consented to the adoption, but Grandmother moved to intervene in the adoption proceeding to contest the adoption. The district court denied Grandmother's request to intervene, finding she lacked standing to do so. Both this court and our Supreme Court affirmed that decision. See generally *In re Adoption of T.M.M.H.*, No. 115,309, 2016 WL 7032112 (Kan. App. 2016) (unpublished opinion), *aff'd* 307 Kan. 902, 416 P.3d 999 (2018). This panel has issued a decision in that companion case today. *In re Adoption of T.M.M.H.*, No. 119,944 (unpublished opinion) (this day decided).

In April 2016, Mother filed an emergency motion to allow her parenting time and a motion to modify custody. In her motion, Mother argued that Grandmother interfered with her parental rights by:

- refusing to allow T.M.M.H. to travel to Colorado for a wedding in Mother's family;
- refusing to allow T.M.M.H. to get a passport to travel to Korea for a church trip with Mother; and
- having T.M.M.H. evaluated by a psychologist without Mother's knowledge or permission.

Mother also filed five amended motions, which included additional allegations about Grandmother. Relatedly, Mother moved to establish summer parenting time and to allow TMMH to spend Mother's Day with her. The district court denied those motions.

In October 2016, Mother moved for summary judgment and to dismiss for lack of subject matter jurisdiction. Judge Ryan denied Mother's motion in June 2017, applying res judicata to Mother's jurisdictional claim and finding that in acting *in loco parentis*, the district court had jurisdiction to approve the parties' parenting agreements under the best interests of the child standard.

In July 2017, Mother moved to recuse Judge Ryan. The chief judge granted the motion in September 2017 and, in November 2017, assigned Judge Neil Foth to the case. Judge Ryan filed a journal entry memorializing his earlier denial of Mother's dispositive motions.

In February 2018, Judge Foth certified Judge Ryan's 2017 decision for interlocutory appeal. But this court denied permission to docket the matter as an interlocutory appeal.

*The Ruling Grandmother Now Appeals*

In May 2018, Grandmother moved to reissue a previous parenting schedule. She also filed a separate action—a Petition for Determination of Parentage under K.S.A. 2018 Supp. 23-2101, seeking to be declared the mother of T.M.M.H. Mother countered by moving for relief from all judgments since 2008 under K.S.A. 2018 Supp. 60-260(b) and moving to dismiss Grandmother's parentage petition. The district court consolidated Grandmother's parentage action with the ongoing grandparent visitation case and heard arguments from the parties.

8

In July 2018, T.M.M.H.'s adoption by his stepfather was finalized.

Soon after, Judge Foth granted Mother's motion to dismiss Grandmother's parentage action and her K.S.A. 2018 Supp. 60-260(b) motion, overturning Judge Ryan's many decisions. He granted sole legal custody of T.M.M.H. to Mother and Stepfather. In September 2018, Judge Foth filed a well-reasoned 52-page memorandum explaining his decisions in detail. He found, among other matters:

- For about 10 years Mother, a fit parent, had been unconstitutionally deprived of her fundamental right to parent her child as she sees fit.
- Judge Ryan erroneously resolved Grandmother's and Mother's motions by using legal standards applicable only between parents.
- Grandparents cannot obtain any permanent form of "custodial rights" or "parental status" through grandparent visitation litigation, or by agreement, or otherwise, beyond those rights conferred to them by statute and relevant caselaw.
- Mother never explicitly waived her rights under the parental preference doctrine by entering into written agreements with Grandmother or in any other way.
- None of the agreements between Mother and Grandmother was permanent.
- A parent can unilaterally modify a grandparent's visitation plan upon motion by showing reasonableness.
- The 2010 mediated agreement on which Grandmother bases her claim of parentage is not a contract establishing that Grandmother is a parent. Its goal was reintegration and its terms establish that Mother did not intend to permanently share decision-making or physical custody with her.
- Absent highly unusual or extraordinary circumstances not present here, the best interests of the child test has no application in determining whether a fit parent is entitled to custody against a third-party nonparent.

9

- Mother and Grandmother's agreements are factually distinguishable from the contract in *Frazier v. Goudschaal*, 296 Kan. 730, 295 P.3d 542 (2013). Judge Ryan's findings that Grandmother "holds an equitable status that is parental in nature," and that she is "an equitable parent or a psychological parent," were based on unwarranted extensions of the holdings in *Frazier* and did not declare her to be a parent.

- Grandmother lacks standing under the Kansas or Uniform Parentage Acts to bring a parentage action to be declared a parent.

- Grandmother was entitled to visitation with T.M.M.H.

Grandmother timely appeals Judge Foth's decision.

*Does Stepfather's Adoption of T.M.M.H. Impact Grandmother's Rights?*

We first address the effect of Stepfather's adoption on Grandmother's appeal. Stepfather has now adopted T.M.M.H. as his son, as Judge Foth's order found. Grandmother contends that the adoption is not final because this appeal is pending, as is her appeal in her visitation and parental rights cases. But Grandmother was not a party to the adoption proceedings and was not permitted to intervene in this case. And generally only an aggrieved party or one permitted to intervene may appeal a judgment. See *Blank v. Chawla*, 234 Kan. 975, 978, 678 P.2d 162 (1984); K.S.A. 2018 Supp. 60-2103. No party or intervenor appealed the adoption, so it became final 30 days after the date the decree of adoption was filed—July 19, 2018. That adoption, decreed after Judge Ryan ruled but before Judge Foth did so, means that T.M.M.H. now has two legal parents: his mother, by birth, and his stepfather, by adoption. Grandmother is not, in law, a parent.

As Justice Rosen foresaw in his dissent in *In re Adoption of T.M.M.H.*, "granting a stepparent adoption could terminate any parental rights of Grandmother." 307 Kan. 902, 941-42, 416 P.3d 999 (2018).

"In addition, if Grandmother is deemed a parent, the stepparent adoption may have an impact on her rights. The statutory scheme for stepparent adoption appears to contemplate only two parents participating as parents in a child's life after the adoption— the birth parent-spouse and the stepparent. See K.S.A. 59-2118; K.S.A. 2016 Supp. 59-2129. Upon a stepparent adoption, the rights of the parent who is not a party to the stepparent adoption cease. See K.S.A. 59-2118(b) ('The adoptive parent shall be entitled to exercise all the rights of a birth parent and be subject to all the liabilities of that relationship. Upon adoption, all the rights of birth parents to the adopted person, including their right to inherit from or through the person, shall cease, except the rights of a birth parent who is the spouse of the adopting parent.')." 307 Kan. at 941-42.

So, even if we assume that Grandmother may have had parental rights to T.M.M.H. at some point, she no longer does.

Grandmother, apparently anticipating this sweeping effect of T.M.M.H.'s adoption, argues that one child may have *three* parents at the same time. She cites no precedent for that assertion. Instead, she cites only one California case—*C.A. v. C.P.*, 29 Cal. App. 5th 27, 240 Cal. Rptr. 3d 38 (Ct. App. 2018), *reh'g denied* (Dec. 13, 2018), *rev. denied* (Jan. 23, 2019), *cert. denied* 140 S. Ct. 97 (2019). That case applied California's three-parent statute which stated:

"In an appropriate action, a court may find that more than two persons with a claim to parentage under this division are parents if the court finds that recognizing only two parents would be detrimental to the child. . . . A finding of detriment to the child does not require a finding of unfitness of any of the parents or persons with a claim to parentage." Cal. Family Code § 7612(c).

See 29 Cal. App. 5th at 35.

There, a wife conceived the child with a coworker (the plaintiff), but at first hid that fact from her husband. The marriage remained intact, and wife and husband parented the child. Yet for the first three years of the child's life, the couple allowed plaintiff to act

in an alternate parenting role, and the child bonded with him. The court applied California's three-parent law and required the married couple to share legal and physical custody of the child with the plaintiff.

But Kansas courts are not bound by any California decision. We in no way find this California case persuasive.

Kansas has no similar statute. Our Legislature does not share Grandmother's view that a child may have, in law, more than two parents at one time. Instead, our statutes defining the parent-child relationship contemplate only two parents. Our adoption laws do so, as Justice Rosen noted. See K.S.A. 59-2118(b) (stating that "[u]pon adoption, all the rights of birth parents to the adopted person . . . shall cease, except the rights of a birth parent who is *the spouse of the adopting parent*." [Emphasis added.]). Our Parentage Act defines the parent-child relationship in terms of "the mother and child relationship and the father and child relationship." K.S.A. 2018 Supp. 23-2205. Similarly, the Assisted Reproductive Technology (ART) statutes repeatedly refer to parents only as "husband and wife," contemplating only two persons being parents in a child's life after the de facto adoption. See K.S.A. 2018 Supp. 23-2301, 23-2302, 23-2303.

Our caselaw does the same. Even though the traditional definition of marriage has been redefined and the parent-child relationship has been expanded, see *Frazier v. Goudschaal*, 296 Kan. 730, 748, 295 P.3d 542 (2013) (holding under some circumstances, a parent-child relationship may be created by contract between a natural mother and her same-sex partner), nothing in our caselaw supports Grandmother's assertion that one child may simultaneously have three parents. See 296 Kan. at 755 (finding the co-parenting agreement "effects equality by giving the children two parents" instead of only one).

Federal law is to the same effect. *Obergefell v. Hodges*, 576 U.S. __, 135 S. Ct. 2584, 2599, 192 L. Ed. 2d 609 (2015), and its progeny address same-sex married *couples* (two persons) and lend no support to Grandmother's claim that one child may have more than two parents at one time. See *Marie v. Mosier*, 196 F. Supp. 3d 1202, 1221 (D. Kan. 2016) (relying on *Obergefell* to enjoin the executive branch of Kansas from "treating same-sex married couples differently" than "opposite-sex married couples" when determining "the other rights, protections, obligations, or benefits of marriage").

Parents have a fundamental liberty interest under the Fourteenth Amendment to the United States Constitution that protects the relationship with their children. See *In re Adoption of G.L.V.*, 286 Kan. 1034, 1060, 190 P.3d 245 (2008). Our law protects what we call the "parental preference" which is "a fundamental right . . . to the care, custody and control of [the parent's] child." *Sheppard v. Sheppard*, 230 Kan. 146, 154, 630 P.2d 1121 (1981) (finding that statute authorizing court to award custody of minor children to third persons without a finding that the parent is unfit, which destroys parent's fundamental right to the care, custody, and control of his or her child, violates due process). Parents' rights over their children cannot be taken without due process of law. 230 Kan. at 154.

"The Fourteenth Amendment provides that no State shall 'deprive any person of life, liberty, or property, without due process of law.' We have long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, 'guarantees more than fair process.' *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). The Clause also includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.' *Id.,* at 720; see also *Reno v. Flores*, 507 U.S. 292, 301-302 (1993).

"The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

*Troxel* examined a statute providing that any person could petition the court for visitation at any time, and that the court could order visitation rights for any person when visitation served the best interests of the child. *Troxel* held that this statute violated the substantive due process rights of mother, as applied to permit paternal grandparents, following the death of the children's father, to obtain increased court-ordered visitation, beyond what mother had thought appropriate, based solely on a state trial judge's disagreement with mother about whether the children would benefit from such increased visitation. Our situation is similar.

Grandparents are categorically in a more disadvantaged status to their grandchildren than parents are to their children. Unlike parents, grandparents have no natural or common-law rights to grandchildren. "Visitation rights between grandparents and grandchildren and between adopted persons and others is purely a province of statute. Grandparents have no natural or common-law rights to grandchildren." *Sowers v. Tsamolias*, 23 Kan. App. 2d 270, 273, 929 P.2d 188 (1996) (citing *Browning v. Tarwater*, 215 Kan. 501, 504, 524 P.2d 1135 [1974]; *In re Johnson*, 210 Kan. 828, 831-32, 504 P.2d 217 [1972]; *In re Bullen*, 28 Kan. [781], *783 [1882]).

In *Sowers* a panel of this court considered whether biological grandparents could be granted visitation of a child after the child was adopted by two non-biological parents. Its facts are distinguishable from those here, as Mother is the biological parent. Yet the panel emphasized, in words generally applicable here, our Supreme Court's rulings that after adoption, the child in effect has new grandparents as well as new parents:

> "This statutory language has consistently been interpreted by our courts as changing the legal status of the child such that the birth or natural parents, after adoption, are strangers or third parties. *Wilcox v. Fisher*, 163 Kan. 74, 78, 180 P.2d 283 (1947); *Browning v. Tarwater*, 215 Kan. at 505; *Jones v. Jones,* 215 Kan. at 112. Not only does the child have new parents, but also the effect is that the child has new grandparents as well. *Browning*, 215 Kan. at 506; *In re Johnson,* 210 Kan. at 834.

14

. . . .

> "Adoption carries with it a complete breaking or severance of the child's ties and relationship with his or her natural parents. *State ex rel. Secretary of SRS v. Clear,* 248 Kan. at 116; *In re Herbst*, 217 Kan. 164, 168, 535 P.2d 437 (1975); *Browning v. Tarwater*, 215 Kan. at 505. Grandparents are considered among the ties from the past of which the new legal relationship is intended to be free. 1 Elrod, Kansas Family Law Handbook § 13.031, p. 13-13 (1990)." *Sowers v. Tsamolias*, 23 Kan. App. 2d at 274-75.

Although they have no natural or common-law rights to grandchildren, grandparents have a statutory right to visitation. See K.S.A. 2018 Supp. 23-3301(c), previously K.S.A. 38-129(b). This statutorily created right has been around, in its present form, since 1984.

> "(a) In an action under article 27 of chapter 23 of the Kansas Statutes Annotated, and amendments thereto, grandparents and stepparents may be granted visitation rights.
>
> "(b) The district court may grant the grandparents of an unmarried minor child reasonable visitation rights to the child during the child's minority upon a finding that the visitation rights would be in the child's best interests and when a substantial relationship between the child and the grandparent has been established.
>
> "(c) *The district court may grant the parents of a deceased person visitation rights, or may enforce visitation rights previously granted, pursuant to this section, even if the surviving parent has remarried and the surviving parent's spouse has adopted the child.* Visitation rights may be granted pursuant to this subsection without regard to whether the adoption of the child occurred before or after the effective date of this act." K.S.A. 2018 Supp. 23-3301. (Emphasis added.)

This statute specifically addresses the interplay of grandparent visitation rights and adoption by providing that the "district court may grant the parents of a deceased person visitation rights, . . . even if the surviving parent has remarried and the surviving parent's spouse has adopted the child." K.S.A. 2018 Supp. 23-3301(c). That is the case here. Grandmother is now "the parent[] of a deceased person."

15

Under this statute, Judge Foth found that Grandmother was entitled to visitation with T.M.M.H. But Grandmother has no right to anything more. Any rights Grandmother may have claimed as a parent, whether based on her written agreements with Mother, the time she spent caring for T.M.M.H., her emotional bond with him, some equitable "parent-like" status, or anything else, ceased when the adoption was finalized. And any rights Grandmother may enforce after the adoption are solely as a grandmother, or "parent of a deceased person," and are limited to visitation, as outlined in the statute above, K.S.A. 2018 Supp. 23-3301.

We recognize, as have other courts, the seeming harshness of this result. The courts have recognized that the change in status effected by adoption and its consequences "may seem harsh, in view of the existing love of a grandparent." *In re Johnson*, 210 Kan. 828, 834, 504 P.2d 217 (1972). But as our Supreme Court stated in *In re Hood*, in finding the grandparent visitation statute did not grant standing to an unrelated third party who claims to be "grandparent like":  "The legislature is the forum to entertain sociological and policy considerations bearing on the well-being of children in our state." *In re Hood*, 252 Kan. 689, 694, 847 P.2d 1300 (1993).

Appellate courts may affirm a district court as right for a different reason if an alternative basis exists for the district court's ruling. See *Hayes v. State*, 307 Kan. 9, 16, 404 P.3d 676 (2017). We do so here, finding that T.M.M.H.'s adoption cuts off Grandmother's rights except for reasonable visitation.

Still, we have fully reviewed the extensive record. The record fails to show that Mother at any time voluntarily and knowingly waived her parental preference rights. None of the three written agreements between Mother and Grandmother contains or evidences such a waiver. As the Supreme Court noted in the companion case, that "Mother made a knowing, intelligent, and voluntary waiver of her parental preference [is] a point Grandmother must establish in order to advance her theory that Mother waived

16

her parental preference and granted parental status to Grandmother." *In re Adoption of T.M.M.H.*, 307 Kan. at 916. And none of the written agreements between Mother and Grandmother comes close to being the kind of co-parenting agreement the Court examined in *Frazier*. We are fully convinced of the correctness of each of Judge Foth's findings set forth above, and of our conclusions in our prior ruling in *T.M.M.H.*, 2016 WL 7032112. We have considered all the arguments advanced by Grandmother in this case and conclude that she fails to show reversible error.

Affirmed.